## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ROLAND ADAMS**                                    **CIVIL ACTION**

**VERSUS**                                          **NO. 11-0816**

**BURL CAIN, WARDEN**                               **SECTION "A"(6)**

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.   For the following reasons, it is hereby recommended that the instant petition be **DISMISSED WITH PREJUDICE**.

## I. **PROCEDURAL HISTORY**[1]

The State of Louisiana indicted two brothers, Roland and Larry Adams, on a charge of second degree murder, a violation of La. R.S. 14:30.1, in connection with the shooting death of Terrell Lampton. Both men pled not guilty at their arraignments. After they were tried together before a jury, Roland Adams was found guilty as charged, and Larry Adams was acquitted. Roland Adams was sentenced to life imprisonment in accordance with La. R.S. 14:30.1(B).

On June 29, 2005, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction and sentence. *State v. Adams*, 909 So.2d 5, No. 2004-KA-2177 (La. App. 4 Cir. June 29, 2005). On February 17, 2006, the Louisiana Supreme Court denied petitioner's writ application. *State v. Adams*, 924 So.2d 1013 (La. 2006).

Following the conclusion of his direct appeal proceedings, petitioner sought post-conviction relief. Petitioner's effort in this regard culminated on April 8, 2011, when the Louisiana Supreme Court denied his writ application. *See State v. Adams*, 61 So.3d 682 (La. 2011).

On April 12, 2011, counsel filed on petitioner's behalf the instant federal habeas corpus application. Petitioner raises the following claims: 1) His constitutional rights

---

[1]A portion of the procedural history was taken from the Louisiana Fourth Circuit Court of Appeal's opinion, *State v. Adams*, 909 So.2d 5, No. 2004-KA-2177 (La. App. 4 Cir. June 29, 2005).

were violated when the trial court failed to sever his case from that of his co-defendant, Larry Adams; 2) he was denied his right to effective assistance of counsel due to counsel's failure to call a potential witness and failure to move for a mistrial; and, 3) prosecutors unlawfully withheld favorable and material impeachment evidence. In its response, the State concedes that petitioner's habeas application is timely and that he has exhausted his state court remedies. (Rec. doc. 14, p. 1). Accordingly, the court shall proceed to address the merits of petitioner's claims following its review of the pertinent facts and applicable standard of review.

## II.  FACTS[2]

On July 17, 2003, at 11:46 p.m., a 911 dispatcher received a call. The caller reported that he had witnessed a shooting in the 1400 block of Deslonde Street in New Orleans. He also stated that he had followed the white van in which the perpetrators fled until he saw police officers stop the van and handcuff its two occupants just a few minutes after the shooting. Several other people also called 911 within minutes to report the shooting.

New Orleans Police Department ("NOPD") Officer Floyd Jackson testified at the trial of the two individuals who had been in the white van the night of the shooting. Officer Jackson stated that on the night of the shooting, he and his partner, NOPD Officer

---

[2]The facts are taken from the Louisiana Fourth Circuit Court of Appeal's opinion, *State v. Adams*, 909 So.2d 5, No. 2004-KA-2177 (La. App. 4 Cir. June 29, 2005).

Precious Davis, went to 1407 Deslonde Street in response to a report that a person was discharging a weapon or was shooting fireworks at that location. While they were en route to the scene, the officers received reports on the police radio channel that a white van was observed fleeing the scene, that the white van had been stopped by police, and that someone had been shot.

When Officers Jackson and Davis arrived in the 1400 block of Deslonde Street, they found a man, who had sustained multiple gunshot wounds, slumped over in the driver's seat of a white Oldsmobile station wagon. The person was totally unresponsive, and he was later pronounced dead. After the officers reached the scene, they immediately cordoned off the area and maintained the integrity of the scene until both emergency medical services and the lead detective arrived.

NOPD Officer Desmond Julian testified at the trial that he and his partner, NOPD Officer Alan Bartholomew, were responding to a call unrelated to the Deslonde Street shooting when they heard several shots. They then proceeded to drive in the direction of the shots. They also heard a broadcast on the police radio channel advising that someone had been shot and that the perpetrators were in a white van. As they were driving to the area where the shots were fired, Officers Julian and Bartholomew saw a white van about a block away. The officers then drove to the area where they saw the van, drove up behind the van, and activated the flashing lights and siren on their police car. The van then stopped.

4

Officers Julian and Bartholomew asked the occupants of the van to show their hands and exit the vehicle.  Larry Adams exited the van on the driver's side, and Roland Adams exited from the passenger side.  Both men were handcuffed and placed near the police car.  Officer Julian then began to look inside the van for a gun, and Officer Bartholomew searched the brothers' names on the computer in the police car.  When Officer Julian did not find a gun in the car, he assumed that the gun had been tossed out of the van. He then began walking in the area searching for a gun on the sides of the street and in the neighboring yards.

After he failed to find the gun, Officer Julian returned to the van.  He leaned over the driver's seat to get a better view of the van's interior, and as he did so, he fell and his arm hit a center console, which was not attached to the vehicle.  When Officer Julian's arm hit the console, the console shifted in such a way that the handle of a gun was then visible.

Officer Julian retrieved the gun and contacted the lead detective on the case, NOPD Sergeant Gregory Hamilton, who told him to leave the gun in the van.  Shortly after Officer Julian found the gun, Detective Hamilton arrived at the scene where the van was being detained, and he told Officer Julian to have the van taken to the evidence cage at police headquarters.  When the tow truck arrived to take the van to the evidence cage, Officers Julian and Bartholomew took the Adams brothers to the police station where they were

separately questioned.  Later both men were taken to police headquarters where they were booked and incarcerated.

After Officer Julian testified at the trial, Officer Bartholomew testified.  Officer Bartholomew's testimony conformed to that of Officer Julian.

Crayton Turner, who had called 911 to report that he had witnessed the shooting and the fleeing of the perpetrators in a white van, was called to testify at the trial. Mr. Turner testified that he lived on Deslonde Street and that he had returned home after work between 11:00 and 11:30 p.m. the night of the shooting.  He parked his car in front of his residence, which was the second house from the scene of the shooting, and remained in the car listening to gospel music.  While he was listening to the music, he heard what he thought were fireworks.

When he heard the sound of fireworks, he got out of his car and saw a man standing with a gun in his hand, and he saw fire coming out of the barrel of the gun.  Mr. Turner said that he heard two shots and then saw eight to ten additional shots being fired. Mr. Turner immediately called 911 on his cell phone while the shooting continued.  He even asked the dispatcher to whom he spoke whether she could hear the gunshots in the background.

Mr. Turner also testified that he saw a white van parked behind the vehicle that was parked in the driveway where the shooting was taking place.  After Mr. Turner saw the

6

man firing the shots, he then saw the man calmly walk around the rear of the white van and get in the front passenger seat. While Mr. Turner was still talking to the 911 dispatcher, he saw the white van leave the scene of the shooting.

Mr. Turner then told the dispatcher that he was going to follow the van and get its license number. Mr. Turner remained on the 911 call with the dispatcher while he followed the white van, and when he saw the van again he told the dispatcher "that's the guys right there." Mr. Turner subsequently saw that the police had stopped the van. When he returned to his residence on Deslonde Street, he told a police officer that he could give the police information regarding the shooting. A week or two later he gave a formal statement to the police.

Mr. Turner also testified that he saw a difference in the complexions of the two men in the van that he followed. He said that the man with the gun had a darker complexion than the driver of the van. Finally, Mr. Turner confirmed that he had reported that the man firing the gun had reached into the back seat of the vehicle in which the victim was shot and retrieved a package "maybe six by six inches."

After Mr. Turner testified, Mildred Lampton, the mother of the victim, testified that an officer at the scene of the shooting showed her two cell phones. She identified one of the cell phones as her phone, but she did not know whose phone the other one was.

7

NOPD Detective Gregory Hamilton testified that he was the lead detective assigned to investigate the shooting on Deslonde Street.  He was responsible for taking control of the crime scene and collecting evidence.

Detective Hamilton stated that two cell phones were recovered from the crime scene.  One cell phone was found on the floorboard of the station wagon in which the victim had been shot, and the other cell phone was found just outside the door of the station wagon. Detective Hamilton's investigation revealed that the cell phone found inside the station wagon belonged to the victim's mother, Ms. Lampton.  She had never seen the other cell phone, however. Detective Hamilton testified that once Roland and Larry Adams were detained, he found that Larry Adams had a cell phone in which the telephone number of the second cell phone found at the crime scene was stored.  The number was stored under the name "Roland."  Detective Hamilton also noticed that although Roland Adams did not have a cell phone with him when he was being interviewed at the police station, he was wearing an empty cell phone holder.

Detective Hamilton identified the gun that was submitted into evidence at the trial as the gun that was removed from the white van.  Detective Hamilton also identified evidence collected during the search of the white station wagon in which Mr. Lampton was killed.

Dr. Paul McGarry, a forensic pathologist, testified that he performed an autopsy on the victim's body.  Mr. Lampton's body had eighteen gunshot wounds.  There were at least two fatal wounds, one in which the spinal cord was severed and one in which the heart was penetrated.  Dr. McGarry recovered six nine-millimeter bullets from Mr. Lampton's body.

NOPD Officer Kenneth Leary, an expert in firearms identification and examination, testified that the gun recovered from the white van was a Glock nine-millimeter semi-automatic handgun with a seventeen-shot magazine and a laser scope.  Officer Leary had test fired a bullet from that gun, and he had compared the markings on the test bullet casing to the bullet casings recovered from the ground next to the station wagon in which Mr. Lampton was shot and from the interior of the station wagon.  He also compared the markings on the test bullet to four of the bullets removed from Mr. Lampton's body during an autopsy.  Officer Leary concluded that all of the bullet casings and four of the bullets recovered from Mr. Lampton's body were fired from the gun that was removed from the white van.  Officer Leary was unable to determine the origin of another bullet recovered from the victim's body and several bullet fragments that were found, because the condition of the specimens were unsuitable for making a definitive determination.  Officer Leary also explained that the laser sight on the gun was usually used at night to locate a target.

Ashley Mitchell, Larry Adams' former girlfriend, testified that she was at her grandmother's house on the night of the shooting.  At approximately 11:37 p.m., she received a telephone call from Larry Adams, who was sitting in the white van outside of her grandmother's house.  She went outside and visited with Larry Adams for a few minutes. She said that Roland Adams was sitting in the van's front passenger seat and that Larry Adams was in the driver's seat.  Ellen Smith, Ms. Mitchell's grandmother, then testified that she answered a telephone call from Larry Adams at approximately 11:37 p.m. that night, and he asked to speak with Ms. Mitchell.

Roland Adams' wife, Mary Adams, testified that she heard her husband speaking with his brother, Larry, on the telephone between 8:00 and 9:00 p.m. on the night of the shooting.  She said that her husband left their home in their white van to meet his brother, who was having car trouble.

The last witness to testify was Roland Adams.  He told the jury that he left his home on the night of the shooting to help his brother, Larry, who was experiencing car trouble.  Roland Adams testified that when they were unable to get Larry's vehicle to run, the brothers drove to Ms. Smith's home so that Larry could visit his girlfriend, Ms. Mitchell. Roland Adams testified that his brother visited with Ms. Mitchell for a few minutes.  Roland Adams also said that he offered to let his brother use the white van so that he, Larry, could

pick up his son.  Roland Adams testified that when the police stopped the van, his brother was driving him home.

Roland Adams claimed that despite his repeated requests, the police refused to tell him why the van was stopped.  Roland Adams further testified that when he was arrested, his cell phone was taken from the cell phone holder on his belt by Officer Julian.  Additionally, according to Roland Adams' testimony, Officers Julian and Bartholomew searched the van but found no weapons or contraband.  After the brothers were transported to police headquarters, their clothes were confiscated.

Roland Adams was on parole at the time of his arrest, and he had been previously convicted for possession of cocaine with the intent to distribute it and for discharging a gun within the city limits.  Roland Adams denied knowing Mr. Lampton and denied killing him.  He said that the police planted the evidence against him and that he was "framed" in connection with Mr. Lampton's death.

## III.  **STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and

fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV. <u>ANALYSIS</u>

### A. Failure to Sever

As noted earlier, petitioner was tried with his brother, Larry Adams.  Larry Adams raised as his defense that he lacked specific intent to kill.  Petitioner asserts that such a defense constitutes an admission that both brothers were at the crime scene.  Such an admission runs counter to petitioner's defense, based on an alibi, that he was not at the crime scene.  Thus, petitioner contends that his brother's defense was antagonistic to his defense.  Therefore, his motion to sever should have been granted.

The United States Supreme Court has held that severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993).  Thus, under federal law, "[t]he test for antagonistic defenses requires that the defenses be irreconcilable or mutually exclusive: the jury, in order to believe one defendant's defense must necessarily disbelieve the antagonistic defense of another defendant ." *United States v. Rocha,* 916 F.2d 219, 231 (5th Cir.1990), *cert denied,* 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991) (citing *United States v. Hernandez,* 842 F.2d 82, 86 (5th Cir.1988)); *McGraw v. Lynn,* 990 F.2d 625, No. 92-3505, 1993 WL 117782 (5th Cir. Mar. 23, 1993). Thus, antagonistic defenses justify severance only when the defenses are "antagonistic to the

13

point of being mutually exclusive or irreconcilable, so that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *United States v. Sandoval,* 847 F.2d 179, 183 (5th Cir.1988) (citation omitted); *Zafiro,* 506 U.S. at 539-40, 113 S.Ct. at 938 (mutually antagonistic defenses are not prejudicial per se and question of severance is left to sound discretion of district court).

In rejecting petitioner's claim, the Louisiana Fourth Circuit provided:

> [A]lthough Roland Adams contends that his brother's defense was antagonistic to his, the record does not reflect this. Larry Adams' counsel did ask several of the State's witnesses whether their testimony indicated that Larry Adams had specific intent to kill Mr. Lampton, but their negative responses in no way implicated Roland Adams in Mr. Lampton's death.

*Adams*, 909 So.2d at 22.

A sampling of the trial testimony, relied upon petitioner in support of the instant claim, supports the above conclusion on the part of the state appellate court.

**Captain Steven Gordon**
> Mr. Ciolino [Larry Adams' Defense Counsel]:
>> None of the documents and none of the tapes that you've talked about today tend to suggest in anyway that Larry Adams had the specific intent to kill anybody, correct?
> Captain Gordon:
>> Correct.

(St. rec., vol. 6, pp. 544-545; Rec. doc. 1-4, petitioner's memorandum, p. 15).

### Officer Desmond Julian

Mr. Ciolino:

And in your search of the van and in your search of Larry, you didn't find anything that suggests that he had any reason to kill the victim in this case, did you?

Officer Julian:

Me, no.

\*    \*    \*

Mr. Ciolino:

In fact, in your search of the van and your search of Larry, you didn't find any evidence that would suggest that Larry had the specific intent to kill anybody, correct?

\*    \*    \*

Officer Julian:

No.

(St. rec., vol. 6, pp. 625-626; Rec. doc. 1-4, petitioner's memorandum, p. 17).

### Dr. Paul McGarry, Forensic Pathologist

Mr. Duffy [Larry Adams' co-defense counsel]:

Doctor, in the results of your autopsy, is there anything connecting Larry Adams to this killing?

Dr. McGarry:

No, sir.

(St. rec., vol. 6, p. 714; rec. doc. 1-4, petitioner's memorandum, pp. 17-18).

**Detective Greg Hamilton**

Mr. Ciolino:

None of those shell casings, or any of the other evidence collected ... suggest that Larry Adams had the intent to kill anybody, correct?

Detective Hamilton:

That's correct.

(St. rec., vol. 7, pp. 792-793; rec. doc. 1-4, petitioner's memorandum, p. 18).

The fact that Larry Adams' defense was that he lacked specific intent to shoot the victim was not irreconcilable with petitioner's defense that he was not at the crime scene. If neither Larry Adams nor Roland Adams were at the crime scene, neither had any intent to shoot the victim. Because the defenses were not mutually exclusive, the trial court's denial of petitioner's motion to sever did not constitute a violation of his constitutional rights.

**B.  Ineffective Assistance of Counsel**

The seminal case for adjudicating a habeas petitioner's ineffective assistance of counsel claim is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), which places on petitioner the burden of demonstrating not only that his counsel's performance was deficient, but also that he was prejudiced as a result of counsel's deficient performance.  If a court finds that a petitioner has made an insufficient showing as

16

to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong. *Id*.

Under the deficient performance prong of the *Strickland* test, "... it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993),quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. A counsel's decision regarding whether to place a criminal defendant on the witness stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." *United States v. Garcia*, 762 F.2d 1222, 1226 (5th Cir. 1985). "'An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable." *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1995), *cert. denied*, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996), quoting *United States v. Acklen*, 47 F.3d 739, 742 (5th Cir. 1995), *cert. denied*, 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 893 (1997). To prove prejudice under the *Strickland* standard, a petitioner "... must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner raises two arguments in support of his ineffectiveness claim. First, petitioner asserts that counsel was ineffective in failing to interview and call as a witness

Glenda Jackson, the person to whom the murder weapon was registered.[3]   According to petitioner, Ms. Jackson's testimony "was potentially exculpatory" because Ms. Jackson could have testified that the gun "was stolen" or "was lent to someone not connected to [p]etitioner", thereby distancing petitioner from the murder weapon.   (Rec. doc. 1-4, petitioner's memorandum, p. 28).

In rejecting the above claim in connection with petitioner's post-conviction application, the district court concluded that petitioner had failed to show with particularity what difference Ms. Jackson's testimony would have made, characterizing petitioner's argument as nothing more than "supposition or conjecture ...."  (St. rec., vol. 10, Transcript of October 29, 2009 Post Conviction Hearing, p. 23).   Further, the state district court concluded that petitioner was not prejudiced, providing:  "[T]he gun was found in the car [in which petitioner was a passenger].  It was the murder weapon.  [Petitioner's] cell phone was found on the scene.  There was an identification.  I just - - I don't see how [Ms. Jackson's testimony] would have changed the outcome."  *Id*.

Thereafter, pursuant to petitioner's writ application, the Louisiana Fourth Circuit Court of Appeal found "no error in the trial court's judgment ...."  *State v. Adams*, No.

---

[3]The jury was made aware of the fact, via the testimony of Detective Greg Hamilton, that the murder weapon "was registered to a Glenda Jackson", as opposed to either of the defendants. (Rec. doc. 1-4, petitioner's memorandum, p. 27).

2010-K-0657 (La. App. 4 Cir. Sept. 3, 2010) (unpublished opinion).[4]   Louisiana Fourth

Circuit Court of Appeal Judge Terri Love, in a reasoned and concurring opinion, provided:

> [A]s to the ineffective assistance of counsel claim relating to trial counsel's
> failure to call the owner of the gun to testify, the trial court properly denied
> relief because there was no showing that the owner's testimony would have
> changed the outcome of the trial or that the relator had been prejudiced.

*Id.*

This court finds that the above reasoning does not represent an unreasonable

application of *Strickland*, *supra*, to the facts of this case.   As such, petitioner's

ineffectiveness claim based upon counsel's failure to interview Glenda Jackson and call her

as a witness at trial is without merit.

Petitioner also argues that counsel was ineffective in failing to request a

mistrial.  In support of this claim, petitioner offers the same arguments set forth in support

of his claim that the trial court erred in denying his motion to sever.  Petitioner asserts that

counsel should have sought a mistrial because his brother's defense of lack of specific intent

was irreconcilable with his alibi defense.  For the reasons set forth above, the court finds that

the two defenses were not mutually exclusive.  (*See* instant Report and Recommendation, pp.

13-16).  As such, counsel was not ineffective in failing to seek a mistrial on such a basis.

---

[4]A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 10.

### C.  Favorable and Material Evidence Unlawfully Withheld

Petitioner argues that the State unlawfully withheld exculpatory evidence.  This exculpatory evidence consists of handwritten notations on the front page of a motions hearing transcript and on the face of a search warrant application.

"The prosecution's suppression of evidence favorable to the accused violates the Due Process Clause if the evidence is material either to guilt or to punishment." *Kopycinski v. Scott*, 64 F.3d 223, 225 (5th Cir. 1995), citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).   Under *Brady* and its progeny, the prosecution is required to disclose to the defense both exculpatory evidence and evidence that would be useful for impeachment.  *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196; *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Bagley*, 473 U.S. 667, 675-76, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).  Thus, to prove a constitutional violation as contemplated under *Brady*, there must be a suppression of evidence which is both favorable to the accused, in terms of being exculpatory and/or useful for impeachment purposes, and material to his or her guilt or punishment.  Materiality is established "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (quotation and citation omitted).

### 1. Notations on Motions Hearing Transcript

While reviewing the closed District Attorney file pursuant to a public records request, petitioner discovered handwritten notations on the front page of a pre-trial motion hearing transcript. One notation provided: "Route taken totally wrong-says pulls behind."

There is no dispute that the above notation refers to Officer Alan Bartholomew's motion hearing testimony regarding the route he and his partner, Officer Desmond Julien, took which led to their interception of Adams' white van. Bartholomew's testimony in this regard differed from Julien's motion hearing testimony. Bartholomew's motion hearing testimony was also inconsistent with the testimony of witness, Crayton Turner. Bartholomew, however, pursuant to the above notation, changed his testimony at trial so that it was consistent with Desmond Julien's testimony and Crayton Turner's testimony. Petitioner submits that the contradiction between Bartholomew's motion hearing testimony and the testimony of Julien and Turner "cannot be overlooked, and the fact that Officer Bartholomew changed his testimony between motions and trial also cannot be overlooked." (Rec. doc. 1-4, petitioner's memorandum, p. 38).

Assuming *arguendo* that the importance which petitioner places on the inconsistency between Bartholomew's motion hearing testimony and the testimony of Julien and Turner, and the inconsistency between Bartholomew's motion hearing testimony and trial testimony, is warranted, petitioner's *Brady* claim nevertheless fails because the above

inconsistencies were not suppressed.  A review of the motion hearing transcript reflects the inconsistencies and, having received a copy of the motion hearing transcript, petitioner was well aware of the inconsistencies.  The fact that the prosecution, based upon its review of the motion hearing transcript, recognized the inconsistencies and specifically noted on the transcript that Bartholomew's testimony was "totally wrong", merely represents a conclusion that anyone's review of the pertinent transcript would have uncovered.

The second notation on the motion transcript provides: "Make sure he says Desmond [Julian] stayed outside the van."  Petitioner fails to specify exactly why he believes this notation constitutes *Brady* material.  As the State points out, the above notation merely "addresses a point that prosecutors wished Officer Bartholomew to emphasize at trial...." (Rec. doc. 14, State's response, p. 36).  Because petitioner has failed to show how this notation is material, the court finds his *Brady* claim to be without merit.

### 2.  Notation on Affidavit Supporting Search Warrant Application

It is undisputed that a search of petitioner's van was performed at the scene without a search warrant.  During that search, a gun, which turned out to be the murder weapon, was discovered.  On that same night, the van was towed to "the N.O.P. D. evidence cage" with the gun in the van.  (Rec. doc. 1-4, petitioner's memorandum, p. 40).  The following day, Detective Greg Hamilton submitted an affidavit in support of a search warrant for the van.  No mention was made in the affidavit that a prior, warrantless search was

conducted, pursuant to which the gun had already been discovered.  A notation on the face of the State's copy of the search warrant application provides:  "Just don't mention already found."  Petitioner contends that this notation "demonstrates a material and intentional omission in the warrant."  (Rec. doc. 1-4, petitioner's memorandum, p. 41).

Petitioner's argument that the above-described notation constitutes *Brady* material is without merit.  Neither the omission of the fact that an earlier search had been conducted nor the basis for this omission, is material.  The warrant application, with or without the fact that a gun had already been found pursuant to a warrantless search, was valid and sufficient to support a warrant authorizing a second search of the van.  As the Louisiana Fourth Circuit Court of Appeal reasoned:

> [A] statement that the van had previously been searched incident to the arrest of Roland Adams and his brother was certainly important information that could have been utilized by the magistrate when considering the application for a search warrant.  **The prior search was lawful, however, so any reference to it in the affidavit would have simply supported a finding of probable cause.**

*Adams*,  909 So.2d at 16 (emphasis added).  Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[5]

New Orleans, Louisiana, this __18th__ day of _____October_____, 2011.



LOUIS MOORE, JR.

United States Magistrate Judge

---

[5]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.